**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

**FRANK KEVIN FISCHER,**

                  **Plaintiff(s),**         **CASE NUMBER: 05-70366**
                                             **HONORABLE VICTORIA A. ROBERTS**

**v.**

**UNITED PARCEL SERVICE,**

                  **Defendant(s).**
_____/

**ORDER**

## I.    INTRODUCTION

This matter is before the Court on Defendant's Motion for Summary Judgment.

For these reasons, Defendant's motion is **GRANTED IN PART** and **DENIED IN PART**.

## II.    BACKGROUND

Plaintiff Frank Kevin Fischer was employed by Defendant United Parcel Service

Company. ("UPS") for 18 years until he was fired in February 2003.  From 1997 through

his termination, Plaintiff was a National Account Manager ("NAM").

This is the second lawsuit Plaintiff filed based upon his employment with UPS.  In

October 2000, Plaintiff filed suit against Defendant alleging race discrimination,

retaliation and harassment.[1]  Plaintiff, an African American, alleged that he was

assigned less desirable accounts because of his race.  The Court granted Defendant

summary judgment and dismissed Plaintiff's claims of race discrimination and

_____

[1] *Fischer v United Parcel Service*, E.D. of Michigan Case No. 00-74997.

retaliation, but allowed his claim of harassment to proceed to trial.  In December 2001, a jury ruled in Defendant's favor.  Throughout most of the proceedings in the first suit, Plaintiff was on medical leave from UPS.  Approximately two months after the trial, in February 2002, Plaintiff returned to work in the same position and under the same supervisor, Alison Jarlett.  Jarlett testified on behalf of Defendant during the trial.

From the time he returned until he was fired, Plaintiff alleges that he was treated and paid less favorably than his peers.  Plaintiff says that his eventual termination in 2003 was in retaliation for his prior lawsuit and complaints over his treatment after he returned to work in 2002.  Plaintiff filed this action alleging retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, *et seq.*, and Michigan's Elliott-Larsen Civil Rights Act, M.C.L. §37.2101, *et. seq.*

The parties have markedly different views about what occurred after Plaintiff returned to work and the reasons that he was fired.  Defendant asserts that Plaintiff was insubordinate and failed or refused to timely complete tasks or assignments from the time he returned to work until he was fired.  Plaintiff says that it was apparent when he returned that Jarlett did not want him back.

***Plaintiff's First Day***

Although Plaintiff and Jarlett had a good working relationship prior to his trial, he says that she immediately began scrutinizing and documenting his conduct.  For example, Plaintiff returned to work on February 4, 2002.  On his way in, Plaintiff called Jarlett to let her know that he would be approximately 15 minutes late due to traffic. After he arrived, Jarlett sent an e-mail to Plaintiff and her immediate supervisor, Marty Thompson, welcoming Plaintiff back and listing the things he needed to do before he

2

could return to an active sales position.  But, Jarlett also included a note that Plaintiff was 31 minutes late in arriving to work that day (although she noted that he called beforehand).  Jarlett testified that she could not recall whether she had ever sent the same type of notice to her supervisor regarding any other employee.

### Plaintiff Required to take Multiple Tests and Assessments before Accounts Assigned

Before Jarlett would assign Plaintiff any accounts, she says he was required to complete various internal assessments and tests to ensure that he was up-to-date on UPS products and federal regulations (on the transportation of goods).  Jarlett said that all NAM's are annually given such assessments and tests.  Jarlett told Plaintiff that he would be able to resume his duties once he passed the tests; he was not given any other assignments and was told to focus solely on studying and taking the tests.

Plaintiff believes that Defendant required him to take the various tests and assessments upon his return in order to delay his return to his full duties until Defendant could "figure out what to do with [him]."  Pl. Exh. A at p. 163.  His belief is based on the fact that he was required to take all of the tests for the 2002 year at one time, when no other NAM was required to do so and the tests did not actually have to be completed until August or October of that year.  Plaintiff attaches a 2002 Assessment Schedule which supports his assertion.  The Schedule indicates that six of nine assessment tests (the same ones presumably Plaintiff had to take) did not have to be completed until the 2nd, 3rd or 4th quarter of the year.  Jarlett acknowledged she had never had an employee take all of the tests at once.  But, she said Plaintiff's situation was unique in that he had been off work for such an extended period (one year).

3

***Plaintiff Restricted to the Office***

On February 7, 2002, Plaintiff did not go into the office or call to indicate that he would be absent.  Plaintiff said he had doctor appointments and elected to work from home.  When Plaintiff returned to work the following day, Jarlett confronted him. Plaintiff subsequently sent Jarlett an e-mail apologizing for failing to give her prior notice of his appointments and decision to work from home.  He further stated that his past experience was that NAMs could use their discretion, and that he was not aware of a new policy.   In the future, Plaintiff promised to keep her informed of his whereabouts and to be accessible by cell phone, if it was common practice to do so.

Jarlett responded with a letter indicating that Plaintiff needed to provide her with advance notice of any time that he would be away from work.  She also indicated that he was required to be in the office during business hours studying his test materials, and that working from home was not an option.  Plaintiff says Jarlett told him that he was restricted to the office and she required that he keep her informed of his whereabouts at all times between 8:00 a.m. and 5:00 p.m., except for his lunch breaks. (He refers to this directive as creating a new position--NAM restricted to the office.).

Plaintiff contends that Jarlett did not exercise such close supervision over other NAMs.  Indeed, one of Plaintiff's co-workers, NAM John Shaughnessy testified that no other NAMs were restricted or required to check-in with Jarlett.  And, with regard to the work from home option, Jarlett acknowledged in her deposition and in an e-mail she sent to one of her supervisors asking him to review her February 8th letter to Plaintiff that all of the NAMs occasionally worked from home.  Jarlett also stated in her deposition that, although there was no formal policy to allow NAMs to work from home at their

4

discretion, it had been common practice to allow it.  Defendant asserts, however, that there was no work for Plaintiff to do from home while he was studying for the assessment tests; the materials and tests remained in the office.

***Jarlett's Early Interactions with Plaintiff***

Plaintiff says that Jarlett interacted differently with him than others.  He noticed during his first few days back that Jarlett did not initiate contact with him.  When she came into the office in the mornings, Plaintiff says Jarlett spoke to everyone but him, and she did not respond when he greeted her.  Plaintiff's assistant, Sonya McQuiter, says she noticed the same after Plaintiff brought it to her attention.  Eventually, Plaintiff says that Jarlett's direct conversations with him became very limited.  He says she spoke directly with other NAMs about business related things common to all of them, but would only send him an e-mail on the same subjects.  Plaintiff cites the testimony of Shaughnessy, as support for his assertion that Jarlett was generally more friendly with other NAMs.  But, Shaughnessy said that he perceived that she was simply more comfortable with people with whom she had certain things in common.  Pl. Exh. H at pp. 31-32.

***Delay in Plaintiff Completing Tests and Assessments***

Jarlett believes that it should have only taken Plaintiff 34 hours to prepare for and complete the necessary tests.  But, when Plaintiff had not passed any of the tests after two weeks, she says he was given a deadline of March 4, 2002.  Plaintiff did not meet the deadline; he did not pass the tests until March 17, 2002, after expending 256 hours.

Plaintiff disputes some of Jarlett's claims.  He says he was never given a date to

complete the tests.  In support of this assertion, he provides copies of two e-mails he sent to Jarlett in February 2002 asking for a date.  He says she never responded in writing.  (However, Plaintiff does not indicate whether she responded in another manner.).  And, contrary to Defendant's suggestion that failing to complete or pass tests was unusual, Plaintiff attaches an e-mail from Jarlett in September 2002 reminding NAMs about tests they were either late in passing or had failed to take.  She congratulated only two (out of nine) NAM's on being current.

After the tests were complete, Plaintiff was assigned a number of accounts, including those he had been assigned before he left on medical leave.

### Plaintiff's File

Jarlett says that she kept a file on all the NAMs under her supervision.  Plaintiff attaches notes from the file Jarlett kept on him in which she documented the date and (alleged) content of various meetings she had with him in February and March 2002. Some of the notes were entitled "Face to Face Meeting" and purportedly memorialized the substance of certain meetings with Plaintiff.  Jarlett testified that she did not believe that she put similarly titled documents in other NAM's files, but that she put notes in other NAM's files from time to time if a situation occurred.  Jarlett says that she felt documentation of certain interaction with Plaintiff was warranted because he began to escalate issues and challenge her authority immediately after he returned to work.

### Plaintiff's Raise

During his trial, Plaintiff learned that he was the lowest paid NAM.  So, on his first day back, Plaintiff submitted a written request to Jarlett for a raise of $600.00 per

month.  She promised to look into it.  Over the following weeks, Plaintiff periodically inquired about the status of his request.  Plaintiff eventually received a raise of $350.00 per month.

Jarlett referred to Plaintiff's raise demand when asked during her deposition whether she thought Plaintiff had a bad attitude.  Jarlett said that she was concerned about how aggressively he pursued certain things right after he returned.  By way of example, she said that he was very aggressive in requesting an immediate answer to his raise demand despite the lengthy procedural requirements of which she presumed he was aware.  Jarlett placed a note in Plaintiff's file on February 4, 2002, however, in which she indicated that Plaintiff advised her when he submitted his raise request that he had never made such a request before and was uncertain about the proper procedure.

Plaintiff further points out that Shaughnessy testified that he was also persistent when he asked Jarlett for raises, and that they sometimes had heated discussions on the subject.  Contrary to her reaction to Plaintiff's persistence, Plaintiff contends that Shaughnessy's vocal persistence did not lead Jarlett to place a document on the subject in Shaughnessy's file.  Plaintiff does not, however, cite any evidence or testimony affirming that Jarlett did not document her interactions with Shaughnessy on the subject.

### Plaintiff's Interactions with Jarlett After Accounts Assigned

After Plaintiff completed the initial testing and resumed his normal duties, he says he noticed that Jarlett failed to reach out to him to strategize about accounts the way she had previously, or to the same extent she reached out to other NAMs.  Plaintiff says

7

Jarlett made very few inquiries about the status of his accounts, expressed little interest in having personal involvement with his customers, did not give him a performance review, seemed uncomfortable interacting with him, and often put him off until a later time when he attempted to speak with her.  Plaintiff says he was "literally left alone" and, therefore, by approximately June of 2002 he began communicating with Jarlett primarily through e-mail.  Pl. Exh. A at p. 46.

In contrast, Shaughnessy says that he spoke with Jarlett about his accounts on at least a weekly basis, and that she provided whatever support he needed with accounts.  Shaughnessy did not, however, indicate whether it was him or Jarlett who initiated the contacts.

Jarlett says that it was Plaintiff who failed to communicate with her between March 2002 and early 2003.  She says he often failed to communicate with her about the status of his accounts, including any problems meeting deadlines on projects or assignments, even after she asked him to do so.

By way of example, Jarlett says that her manager, Steve Harmon--Vice President of Strategic Accounts for the region--scheduled a meeting for January 28, 2003 with each of the NAMs under Jarlett's supervision.  He wanted to discuss specific account strategies.  Therefore, Jarlett instructed all of her NAMs to complete PowerPoint templates that would be used to introduce their accounts to Harmon by January 21, 2003.  Plaintiff failed to turn in the assignment until January 23rd, after Jarlett inquired about the status and despite Plaintiff's promise on January 20 that it would be completed on time.  She says Plaintiff did not offer any explanation for why he failed to meet the deadline.

8

The day before the meeting with Harmon, Jarlett had a conference call with all the NAMs and reminded them to be at work the following day by 7:45 a.m. for the 8:00 a.m. meeting.  Jarlett says Plaintiff did not appear in the meeting the next day until 10:00 a.m.  Plaintiff did not advise anyone prior to the meeting that he would be late, and she says that he did not offer an explanation for his tardiness after he arrived.  During the meeting, Jarlett says Plaintiff did not actively participate in the meeting and even fell asleep.  She says that he also stood and stared out of a window with his back to the group for part of the meeting.  After the meeting, Harmon discussed Plaintiff's conduct with Jarlett and recommended that she enlist Human Resources' assistance to address his behavior.

Plaintiff offers a different perspective.  He says that on January 28, 2003, he experienced severe back pain on the morning of the meeting.  But, he went to work because he was aware that the meeting was important to Jarlett.  Plaintiff says that he arrived in the building ten minutes after the meeting started, but he did not enter the meeting for approximately one hour because he did not want to interrupt the presentation.

When he entered during a break, Plaintiff says he explained to Jarlett that he was in severe pain and asked to leave.  He says Jarlett asked if he could stay long enough to make his presentation.  Plaintiff agreed.  He says he also made a point of explaining his medical situation to Harmon, and that he apologized for having to leave early.  Plaintiff says both Harmon and Jarlett appeared to accept his explanation and told him that he could leave.  Harmon says that he does not recall the apology or explanation.  But, Harmon said that he would not have had a problem with Plaintiff standing during

9

the meeting if he, indeed, was experiencing back pain.

Plaintiff disputes Jarlett and Harmon's assertion that he was not attentive during the meeting. He says that, at times during the meeting, he stood (as did others) and closed his eyes because of his back pain. He denies that he ever fell asleep.[2] And, Plaintiff says he later learned that Shaughnessy also arrived late.

### *Plaintiff's Cell Phone Bill*

In early 2003, Plaintiff says Jarlett treated him differently than other NAMs when he had an unusually high cell phone bill. Plaintiff said he had to travel to Canada to pursue a business opportunity with a customer. While there, he spent a lot of time on his company cell phone. When the bill arrived, the charges exceeded $500.00 for that period of time--primarily due to roaming and connection fees. Jarlett's policy with regard to cell phone usage was that NAMs were to keep the bill below $100.00 per month.

Plaintiff was surprised at the charges and contacted the carrier. He negotiated to lower the charges. In the interim, in January 2003, Plaintiff submitted an expense report to Jarlett which included the cell phone bill. But, he also included a note explaining why the charges were so high and offering to take responsibility for $250.00. Plaintiff says Jarlett demanded that he pay the bill and accused him of incurring the charges on personal business. He says she persisted in requesting reimbursement from him until

---

[2]Because Shaughnessy sat next to Plaintiff during the meeting, Plaintiff cites his testimony in support of Plaintiff's assertion that he did not fall asleep. However, this question was not directly asked of Shaughnessy (at the cited pages). The examiner only asked if Shaughnessy recalled any meetings where there was an issue raised or an allegation that Plaintiff fell asleep. Shaughnessy said that he did not recall any such allegation. Pl. Exh. H at p. 34.

10

the bill was paid.  Ultimately, however, Plaintiff negotiated with the carrier to reduce the charges to $20.00 and he was fully reimbursed.

Shaughnessy testified that he sometimes exceeded the cell phone limit.  He did not recall any quite as high as $500.00, but he said they got "up there."  When that occurred, Shaughnessy said the procedure was to write a note on the receipt explaining the charges.  He says Jarlett approved his reports[3] and never accused him of incurring expenses for personal business.

***February 4th Training Session***

Events which Jarlett says contributed to the decision to fire Plaintiff began on February 4th 2003.  Jarlett says that UPS instituted an initiative in January 2003 to ensure that NAMs were informed about its LPL[4] shipping products.  Jarlett set up a training session for 8:00 a.m. on February 4, 2003.  Prior to the session each NAM was directed to review study guides, take a quiz on the materials and complete a checklist. The materials were distributed to everyone on January 14, 2003.  Between January 14th and February 3rd, Jarlett says she sent at least four e-mail reminders to each NAM that the review and quiz had to be completed by 3:00 p.m. on February 3rd.  Plaintiff was designated as a team leader" for the February 4th training session.

Plaintiff did not take the quiz prior to the training session and he did not show up for the session.  He did not call Jarlett to advise that he would be absent until forty-five

---

[3]He was not asked (at the cited pages) whether she ever denied a report or required him to reimburse the amount over the limit.

[4]"LPL" stands for "less than pallet load" and refers to shipments of a smaller quantity of goods which is subject to different rates than pallet shipments.

minutes after it began.  And, he only left a voice mail stating that he had been in an automobile accident and would be in later that day.  He did not provide any information about whether he was injured, and he did not come in later that day as promised.

The next day, Plaintiff took and failed the quiz.  Jarlett says she then decided to get Human Resources involved to impress upon Plaintiff that his behavior was inappropriate and that he needed to comply with managerial requests.  Jarlett set up a meeting late that afternoon with Plaintiff, herself and Annie VanTilburg, the District Human Resources Manager for the Livonia office where Plaintiff worked.

### February 5th Meeting

Jarlett and VanTilburg prepared notes memorializing the meeting.  VanTilburg says the conversation began with Jarlett advising Plaintiff that he was not communicating well with her.  Jarlett also brought up his failure to complete the LPL training or properly communicate with her about his absence.  VanTilburg notes that Plaintiff offered various explanations for his failings and committed to taking the missed test.  But, VanTilburg states that Plaintiff also stated that Jarlett had not communicated well with him since his return in February 2002, and that he just wanted to be treated the same as everyone else.

Shortly thereafter, ten minutes into the meeting, VanTilburg says Plaintiff raised his voice and became belligerent.  Jarlett says Plaintiff became agitated and raised his voice after she told him that he was the only manager who fails to communicate and follow up with her.

When VanTilburg began to advise Plaintiff of his basic job responsibilities, she says that he said that he would listen but would not respond to any more questions.

12

Plaintiff says that he did so because he had answered the questions multiple times.

VanTilburg indicates that Plaintiff told her to put her expectations of him in writing.  She refused, but read a list for him to write down.  Plaintiff then stated that he was uncomfortable with the meeting, asked that it be stopped and stated that he wanted a third party to be present.  Jarlett told Plaintiff that he needed to complete two tests (LPL and MMS[5]) he missed as well as two training sessions (LPL and MMS).  Plaintiff again asked that his job expectations be put in writing.  VanTilburg again declined to do so.  The meeting ended at approximately 6:00 p.m. after Plaintiff advised that he would get the missed training.

Shaughnessy testified that he also missed the February 4th training due to a customer conflict; he had another meeting scheduled.  He says Jarlett let him know that he missed the training and advised him to reschedule.  He rescheduled within one week and says Jarlett did not indicate that there was any problem.

VanTilburg testified that the meeting with Plaintiff was a formal, disciplinary action and that Plaintiff was advised as much.  However, she admits that there is no indication in her notes or any other written document that the meeting was disciplinary or that Plaintiff was so advised.  And, VanTilburg indicated that the normal disciplinary method, in the appropriate situation,[6] included a "30-60-90" day progressive procedure.  Human Resources would meet with the employee and the manager, procure a commitment from the employee to change the behavior at issue, and all would agree on

---

[5]MMS stands for "Making Major Sales."

[6]At the cited paged, she did not indicate what constitutes an appropriate situation and whether Plaintiff's situation qualified.

13

a course of action.  Thereafter, there would be follow-up meetings with the employee at 30, 60 and 90 day intervals.  There is no indication that the 30-60-90 day procedure was used in this case.

### February 6th Confrontations

Shortly after the February 5th meeting ended, Jarlett found out that the last training sessions were being held the following morning at 8:00 a.m.  She says she left voice mail messages on Plaintiff's cell phone and at his office indicating that his attendance was mandatory.

Plaintiff denies that Jarlett called him on his cell phone.  And, he testified that he did not get her message at the office until the next morning.  In fact, he sent Jarlett an e-mail at 8:38 a.m. on February 6th advising her that he had a customer visit scheduled for 10:00 a.m.  At 8:41 a.m., Jarlett responded with an e-mail referencing her voice mail messages from the night before and advising Plaintiff that he was required to attend the LPL training sessions that day.  She directed him to cancel the customer visit.  At 8:58 a.m., Plaintiff responded that he did not receive her message about the training until 8:42 a.m. that morning (which would have been after he sent his first e-mail to her).  He again asserted that he had a customer visit scheduled.  Additionally, he advised that he had an appointment to have his car serviced that afternoon, and that the repairs were necessary to ensure the safety of his vehicle.

Plaintiff further expressed his concern with the timeliness of Jarlett's message since she told him the night before that he had to pass the LPL test before attending the training session.  Plaintiff then stated that he was requesting an immediate Employee Dispute Resolution meeting, he wanted to have his attorneys present, and that he was

14

concerned about the continuing racial discrimination, harassment and retaliation by her. Plaintiff, nevertheless, went to the training session and left at noon (with Jarlett's permission) to take his car for service.

Plaintiff contends that Jarlett later demonstrated her irritation with the fact that he invoked the dispute resolution process by directing him to attend the LPL training, in a stern, agitated tone in front of others.

### Plaintiff Formally Alleges Retaliation

At some point on February 6th, Plaintiff filed a formal complaint against Jarlett through Defendant's Corporate Help Line.[7]  Plaintiff asserted that Jarlett held him to different standards than his peers, by requiring him to: 1) keep her informed of his whereabouts at all times, 2) clear his travel schedule with her on a daily basis before visiting clients, and 3) pay for certain business calls she found to be excessive.  Plaintiff stated that he believed Jarlett's treatment of him was in retaliation for his prior lawsuit against Defendant.

Defendant asserts, and Plaintiff does not deny, that this is the first time Plaintiff complained to anyone in Human Resources about alleged retaliation.  But, Plaintiff says he made the first complaint to Jarlett a few weeks after he returned to work.  He says he told Jarlett that he felt that his restriction to the office, the requirement that he report his

---

[7]Defendant and Plaintiff (in his deposition) both indicate that this complaint was filed on February 6, 2003.  But, the document Defendant attaches in support actually states that the complaint was received on February 7, 2003.  Plaintiff attaches the same document with February 7th crossed out and February 6th at 8:10 a.m. written in its place.  It is not clear, however, who modified the document.  But, since the parties do not dispute the date Plaintiff filed the complaint, it is presumed that the February 6th date is accurate.

whereabouts to her every minute of the day, and the continuing disparity in pay, were all in retaliation for his lawsuit. Defendant's "Professional Conduct and Anti-Harassment Policy" allows employees to report objectionable conduct to a supervisor or manager (or various others).

**February 11th Meetings/Plaintiff's Termination**

### First Meeting

Defendant says Plaintiff's behavior deteriorated further after February 6th. Defendant says Plaintiff failed to complete the training tests by the dates agreed upon, failed to discuss administrative matters regarding expense reports with Jarlett and refused to meet with Jarlett about a customer account. Therefore, Jarlett and VanTilburg called another meeting with Plaintiff on the morning of February 11, 2003 to discuss these and other failings. However, VanTilburg indicates in her notes that Plaintiff listened but refused to respond or answer questions. Because Plaintiff continued to refuse to participate, Jarlett and VanTilburg took Plaintiff out of service, and Jarlett advised Plaintiff that she was going to recommend his termination. Plaintiff was directed to turn in his laptop computer, corporate credit card and UPS identification. He was further instructed not to have any contact with UPS employees and that he would be contacted by telephone to schedule future meetings.

Plaintiff disputes the validity of some of the criticism leveled at him during the first meeting. He disputes Jarlett and VanTilburg's claim that he did not follow through as promised after the February 5th meeting. He says that he attended the LPL make-up session on February 6th, he attended MMS training and passed the test on February 7th,

16

and he began studying for the LPL test after receiving the proper study materials. Therefore, within 48 hours, Plaintiff asserts that he completed two of the three tasks asked of him in the February 5th meeting.[8]

Plaintiff disputes that he was given a deadline for completing the MMS test and that he failed to deliver it to Jarlett in an appropriate manner. He says Jarlett took issue with the fact that he did not put the test in her hands on February 7th (a Friday) or otherwise notify her that he had completed it. But, he says that he left the completed test on Jarlett's desk late that day (at approximately 5:00 p.m.) because she was not in her office. Plaintiff contends, and Shaughnessy and McQuiter testified, that it was common practice to leave documents on Jarlett's desk if she was not there.

Plaintiff also disputes VanTilburg and Jarlett's criticism for his failure to take the LPL test on February 6th or 7th, inasmuch as Jarlett directed him to do other things on those days (attend LPL and MMS training). In fact, VanTilburg indicates in her notes that Plaintiff stated as much during the meeting.[9]

Finally, Plaintiff points out that VanTilburg noted, but did not investigate his

---

[8]To demonstrate his claim that others were not disciplined for the same transgressions for which he was disciplined, Plaintiff cites McQuiter's testimony that Shaughnessy was not present on the 7th for the MMS training. McQuiter, however, testified that she did not know whether his absence was excused and she was not asked (at the cited pages) about whether he was disciplined. Plaintiff points out that Shaughnessy failed the MMS test the first time and had to re-take it. But, Jarlett testified that Shaughnessy took the first test by the deadline--February 4th.

[9]He said, "I was in training on the 6th--when would I have studied for that test?" Pl. Exh. FF.

17

assertion that Jarlett was not being truthful.[10]  And, he says Jarlett brought up the cell phone bill again, although the matter had been addressed by that time and was moot.

### Second Meeting

Jarlett and VanTilburg called Plaintiff back to the office for a second meeting in the afternoon on February 11th.[11]  VanTilburg also asked Security Manager Tracy Patterson to be present.  During this meeting, Jarlett said that she gave Plaintiff another opportunity to commit to improve his performance.  Had he done so, she said that Plaintiff would not have been fired.  However, Jarlett says that Plaintiff again refused to communicate during the meeting or to make the necessary commitments.  So, at the conclusion of the second meeting, VanTilburg advised Plaintiff that he was terminated for behavior unbecoming a manager.[12]  Plaintiff indicated that he had no questions about the decision.  Patterson escorted Plaintiff from the building.

Plaintiff denies that Jarlett or VanTilburg asked him to commit or agree to address the issues raised in the second meeting.  Rather, he says the meeting was approximately five minutes long, during which VanTilburg asked for his calling card, told him he was fired for conduct unbecoming a manager and had him escorted out of the building.  Plaintiff denies Jarlett's assertion in her notes that he was "uncooperative, insubordinate, belligerent and unprofessional" during either of the meetings. Pl. Exh. JJ.

---

[10]Because parts of VanTrilburg's notes are cut off or illegible, it is not clear what Plaintiff was referring to when he made the claim.  *See* Pl. Exh. FF.

[11]Jarlett participated in the meeting by telephone.

[12]It is unclear when or how she did so, but Jarlett said that she made the recommendation that Plaintiff be fired after the second meeting.

***Miscellaneous Allegations***

### <u>Comments by Jarlett</u>

Plaintiff says Jarlett made comments suggesting that his departure from the company was anticipated long before his termination.  In October 2002, the office where Plaintiff and Jarlett worked was renovated.  During the renovation, the seating arrangement for the NAMs and their assistants was reconfigured.  Because Plaintiff's assistant, Sonya McQuiter, was not seated next to him, he asked that she be moved closer.  Jarlett's assistant, Cheryl Vaughn, changed the seating but commented to McQuiter that Jarlett said that she did not know why Plaintiff wanted to change since he was not going to be there long anyway.

### <u>Reassignment of Plaintiff's Accounts</u>

The day before Plaintiff was fired, Jarlett reassigned Plaintiff's accounts to another NAM, Greg Jackson, without notifying Plaintiff first.  Plaintiff contends that reassigning files in this manner was atypical.  Jackson testified that he never had his accounts reassigned without notice.  Moreover, Plaintiff contends that the reassignment of his accounts on February 10th is evidence that the decision to fire him had been made before the meeting with Jarlett and VanTilburg on February 11th, contrary to Jarlett's claim that she did not recommend his termination until after the second February 11th meeting.

Defendant contends that Jackson indicated in his deposition that he was actually unclear whether the files were reassigned on February 10th or another date.  However, a

19

memo Jackson prepared in February 2003 indicated that February 10th was the correct date, and Jackson was not able to refute the accuracy of the memo.

### Jackson's False Claims

After Plaintiff was fired, Jackson prepared a memo to Jarlett alleging that Plaintiff neglected his accounts and that customers complained about his handling of them. Two customers, however, submitted written notes denying that they made any such complaint or that they were dissatisfied with Plaintiff's work.  Jackson said he prepared the memo (on his own initiative) to advise Jarlett what the condition of the accounts were when he got them, just in case the customers expressed concerns or issues after he took over.

### VanTilburg's Exercise of Authority Although Plaintiff was not in her Jurisdiction

Plaintiff points out that VanTilburg assumed responsibility over him although he was not actually within her jurisdiction.  Plaintiff's direct Human Resources Manager was Henry Short, an African American based in Atlanta, Georgia.  However, VanTilburg did not advise Short prior to February 5th that she was taking disciplinary action against Plaintiff.  She said that she did not do so because she was local and Short was not. Short testified that VanTilburg told him sometime prior to Plaintiff's termination that Plaintiff was going to be fired for failing to follow instructions to attend a training. Plaintiff contends that this shows that the termination decision was not a spontaneous decision.  However, Short also said that he did not remember how far in advance of Plaintiff's firing he was notified.

### Plaintiff's Post-Termination Complaint

20

Plaintiff filed a complaint with the Michigan Department of Civil Rights and EEOC on February 20, 2003.  He asserted that, on January 13, 2003, a representative of Defendant asked him to drop his appeal of the first lawsuit and he declined.  Plaintiff alleged that he was fired because he refused to drop his complaint.

## III.   STANDARD OF REVIEW

Under Fed. R. Civ. P 56(c), summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Copeland v. Machulis*, 57 F.3d 476, 478 (6th Cir. 1995).  A fact is "material" and precludes a grant of summary judgment if "proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle[s] of law to the rights and obligations of the parties."  *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984). The court must view the evidence in the light most favorable to the nonmoving party and it must also draw all reasonable inferences in the nonmoving party's favor.  *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995).

The moving party bears the initial burden of showing that there is no genuine issue of material fact.  *Snyder v. AG Trucking Co.*, 57 F.3d 484, 488 (6th Cir. 1995).  To meet this burden, the movant may rely on any of the evidentiary sources listed in Rule 56(c).  *Cox*, 53 F.3d at 149.  Alternatively, the movant may meet this burden by pointing out to the court that the nonmoving party, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case, and on

21

which that party will bear the burden of proof at trial.  *Tolton v. American Biodyne, Inc.*, 48 F.3d 937 (6th Cir. 1995); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989). The moving party does not, however, have to support its motion for summary judgment with evidence negating its opponent's claims.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1985).

Once the moving party has met its burden, the burden shifts to the nonmoving party to produce evidence of a genuine issue of material fact.  Rule 56(e); *Cox*, 53 F.3d at 150.  The nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of its complaint.  *Copeland*, 57 F.3d at 479.  The mere existence of a scintilla of evidence to support the nonmoving party position will be insufficient; there must be evidence on which a jury could reasonably find for the nonmoving party.  *Snyder*, 57 F.3d at 488; *Tolton*, 48 F.3d at 941.

## IV.    APPLICABLE LAW AND ANALYSIS

Plaintiff alleges that he was fired in retaliation for his prior lawsuit and the internal complaints of retaliation that he made after he returned to work.  He asserts his claim under Title VII and the ELCRA.

### A.    Plaintiff Failed to Exhaust his Administrative Remedies for his Title VII Claim Based on his Internal Complaints

Defendant contends that Plaintiff cannot base his Title VII retaliation claim on his internal complaints to Defendant and Jarlett because he failed to exhaust his administrative remedies before filing suit.  Defendant is correct.

"It is well settled that federal courts do not have subject matter jurisdiction to hear Title VII claims unless the claimant explicitly files the claim in an EEOC charge or the

22

claim can be reasonably expected to grow out of the EEOC charge." *Strouss v*

*Michigan Department of Corrections,* 250 F.3d 336 (6th Cir. 2001). A retaliation claim

can reasonably be expected to grow out of a charge when it is based on conduct which

occurred after the charge was filed. *Id.* "However, retaliation claims based on conduct

that occurred *before* the filing of the EEOC charge must be included in that charge." *Id.*

On February 20, 2003, Plaintiff filed an EEOC complaint in which he only alleged

that he was terminated for refusing to withdraw his appeal of his civil suit against

Defendant:

> On or about October 2000, I filed a discrimination complaint based
> on race against the respondent. Currently this matter is on appeal in
> federal court. On January 13, 2003, the respondent's representative
> asked and I refused to withdraw my appeal. On February 11, 2003, I
> was terminated allegedly for not speaking to my manager. I have no
> prior discipline and I believe I was terminated in retaliation for
> refusing to drop my discrimination complaint.

Def. Exh. 26. Plaintiff does not mention his internal complaints and, contrary to

Plaintiff's assertion, a claim of retaliation based on those complaints does not naturally

flow from the allegations made.

Plaintiff's reliance upon *Tisdale v Federal Express Corp.,* 415 F.3d 516 (6th Cir.

2005) is misplaced. In *Tisdale*, the plaintiff filed an EEOC charge alleging that his

discharge was discriminatory. He did not, however, explicitly allege retaliation or check

the box labeled "retaliation." The *Tisdale* Court, nevertheless, found that his claim of

retaliation could reasonably be expected to grow out of the charge he filed because of

various factors unique to the plaintiff's situation. Namely: 1) the plaintiff was not

represented by counsel when he prepared the charge; 2) he did not know what the word

"retaliation" meant; 3) he did not prepare the charge himself; he recounted his story to

23

an EEOC clerk who drafted the charge; and 4) the charge contained several factual errors plaintiff said he did not catch because of his dyslexia.  Additionally, the Court noted that plaintiff's discrimination and retaliation claims were based on the same core of operative facts; he did not base his claim on any other alleged acts.  Based on all of these factors, the *Tisdale* Court found that an EEOC investigator would be prompted to investigate the uncharged retaliation claim, since plaintiff did allege that he believed race was a factor in his discharge and one could infer that Plaintiff also told the EEOC that he was fired after he complained about disparate treatment of African American employees.

Plaintiff Fischer has not presented evidence that analogous or other circumstances led him to omit reference to the internal complaints from his EEOC charge.  Therefore, *Tisdale* does not apply and the Court GRANTS Defendant's request for summary judgment on this claim.

### B.   There is a Question of Fact on Plaintiff's Claim that he was Fired in Retaliation for Filing a Lawsuit

There is a question of fact on Plaintiff 's federal and state law claims that he was fired in retaliation for filing the prior lawsuit.  But, he failed to meet his burden on his state law claim that he was fired in retaliation for filing the internal complaints.

The retaliation provisions in Title VII and the ELCRA are substantively the same. They both prohibit an employer from retaliating against an employee who opposes acts which are unlawful under the statute or who makes a charge or complaint under the

statute.[13]  Michigan courts look to federal precedent interpreting Title VII for guidance in

ELCRA claims.  *Barrett v Kirtland Community College,* 245 Mich. App. 306, 314 (2001).

Therefore, the analysis under both statutes is substantially similar.

In order to establish a prima facie case of retaliation under either statute, Plaintiff

must show:

> (1) that he engaged in a protected activity; (2) that this was known by
> the defendant; (3) that the defendant took an employment action
> adverse to the plaintiff; and (4) that there was a causal connection
> between the protected activity and the adverse employment action.

*Garg v Macomb County Community Mental Health Services,* 472 Mich. 263, 273 (2005).

*See also EEOC v Avery Dennison Corp.,* 104 F.3d 858, 860 (6th Cir. 1997).  When the

claim is based on circumstantial evidence, the three-step *McDonnell Douglas*[14] burden

shifting approach applies:

---

[13]Title VII states:

> It shall be an unlawful employment practice for an employer to
> discriminate against any of his employees or applicants for
> employment . . . because he has opposed any practice made an
> unlawful employment practice by this subchapter, or because he has
> made a charge, testified, assisted, or participated in any manner in
> an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. §2000e-3(a).  The ELCRA states:

> Two or more persons shall not conspire to, or a person shall not:

> (a) Retaliate or discriminate against a person because the person
> has opposed a violation of this act, or because th person has made a
> charge, filed a complaint, testified, assisted, or participated in an
> investigation, proceeding, or hearing under this act.

M.C.L. §37.2701(a).

[14]*McDonnell Douglas Corp. v Green*, 411 U.S. 792 (1973).

> First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden [of production] shifts to the [employer] "to articulate some legitimate, nondiscriminatory reason for [the adverse employment action]." Third, should the [employer] carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Avery Dennison Corp.*, 104 F.3d at 862 (*citing Texas Department of Community Affairs v Burdine,* 450 U.S. 248, 252-253 (1981))(emphasis omitted).

A plaintiff's burden at the *prima facie* stage is not onerous; it is easily met. *Id* at 861. But, the burden of persuasion is on the plaintiff at all times. *Zanders v National Railroad Passenger Corp.,* 898 F.2d 1127, 1135 (6th Cir. 1990). Defendant only has the burden of production. "[D]efendant need not persuade the court that it was actually motivated by the proffered [legitimate, non-discriminatory] reasons." *Burdine,* 450 U.S. at 255. An "employee's prima facie case of discrimination will be rebutted if the employer articulates lawful reasons for the action; that is, to satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." *Id* at 257.

Here, Plaintiff relies upon circumstantial rather than direct evidence of retaliation. Therefore, the *McDonnell Douglas* burden shifting approach applies.

### i.    Prima Facie Case

Defendant only disputes whether Plaintiff established the last element of a prima facie claim for each remaining allegation--causation. State and federal courts apply a somewhat different analysis of this element.

26

Under Title VII, Plaintiff is only required "to show a causal relationship between the protected conduct and the adverse action." *Smith v City of Holland Board of Public Works,* 102 F.Supp. 2d 422, 429 (W.D. Mich. 2000). "In order to make such a showing, a plaintiff must produce evidence from which an inference can be drawn that his protected activity was likely the reason for the adverse action." *Id.*

Michigan courts impose a higher burden. "To establish causation, the plaintiff must show that his participation in [the protected activity] was a 'significant factor' in the employer's adverse employment action, not just that there was a causal link between the two." *Barrett,* 245 Mich. App. at 315.

### a.    Plaintiff's Lawsuit

A close question, but nonetheless there is a question of fact under both state and federal standard law on Plaintiff's claim that Defendant fired him in retaliation for filing a lawsuit against Defendant. Plaintiff contends that Jarlett immediately began scrutinizing him more closely than she scrutinized his colleagues. For example, she sent written notification to her superior that Plaintiff was late to work on his first day, following conclusion of the trial, even though he called to explain that he would be late and why. And, Jarlett said she could not recall having done the same with any other employee. There is also evidence that Jarlett required that Plaintiff take all of the 2002 assessment tests at one time when he returned and delayed in assigning him accounts, even though Defendant's testing schedule indicates that other employees were not required to complete the majority of the tests until later in the year. Finally, Plaintiff claims Jarlett failed to reach out to him about his accounts the way she had previously or to the same

27

extent she reached out to other NAMs.[15]

An employee can establish causation through evidence that acts of retaliation occurred in close temporal proximity to protected conduct and with evidence that an employer scrutinized him more carefully than comparably situated employees. *Clark County School District v Breeden*, 532 U.S. 268, 276 (2001); *Harrison v Metropolitan Government of Nashville and Davidson County Tennessee,* 80 F.3d 1107, 1119 (6th Cir. 1996), *overruled in part on other grounds by, Jackson v Quanex Corp.,* 191 F.3d 647, 667 n.6 (1999). Here, there is evidence which, when construed most favorably to Plaintiff, shows that Jarlett scrutinized him more carefully and more critically than other employees, that she was less attentive to him than she was prior to his lawsuit and as compared to other NAMs, and that she imposed greater requirements on him (by requiring that he take all of his tests at once) than was placed on his colleagues.

Although Plaintiff filed his lawsuit over fourteen months prior to these alleged acts, he was on medical leave throughout most of the proceedings. The alleged retaliatory acts began when the opportunity first presented itself, immediately after he returned to work just two months after the lawsuit concluded.

### b.    Plaintiff's Internal Complaints

Although Plaintiff's burden at the prima facie stage is minimal, he failed to meet that burden with regard to his remaining state law claim that he was fired in retaliation

---

[15]Among other things, Plaintiff also cites Jarlett's alleged comment to her assistant in October 2002 that Plaintiff would not be around for long. Defendant contends, however, that this alleged comment is inadmissible hearsay which the Court cannot rely upon on summary judgment. Plaintiff contends that the comment is a company admission which is not hearsay under FRE 801(d)(2)(D). Because there is other evidence which supports Plaintiff's claim, the Court need not resolve this dispute at this time.

for filing complaints alleging retaliation after he returned to work.  Plaintiff said that he made the first complaint verbally to Jarlett within a few weeks of his return.  He made two additional complaints the day after the first meeting with Jarlett and VanTilburg (one directly to Jarlett and a second through the formal complaint process).

With regard to the first oral complaint to Jarlett a few weeks after he returned, Plaintiff does not present any evidence which suggests that his first complaint was a factor (significant or otherwise) in the decision to fire him.  And, Plaintiff was not fired until approximately eleven months later.  When a claim of retaliation is based on temporal proximity alone, the temporal proximity must be very close.  *Clark*, 532 U.S. at 273.  There being no other evidence that his oral complaint to Jarlett was a factor, eleven months is not sufficiently close in time to establish causation even at the prima facie stage.  *See Bolander v BP Oil Co.,* 128 Fed. Appx. 412, 418 (6th Cir. 2005)(unpub. op.), *cert den.,* 126 S.Ct. 396 (2005)(seventeen month gap too long absent other evidence of retaliation).

The fact that Plaintiff was fired five days after he made two additional complaints is also insufficient, by itself, to establish causation.  Other than the proximity in time, there is no evidence that Plaintiff's additional two complaints were a factor in the decision to fire him.  And, the proximity in time is undercut by the fact that Plaintiff did not file the complaints until the day after he was first formally placed on notice of performance problems.  The Michigan Court of Appeals found that causation was lacking under similar circumstances.  In *Gonclaves v Community Support and Treatment Services,* 2006 W.L. 475282 (Mich. App. 2006), the Court held that temporal proximity alone was insufficient since the plaintiff knew that his position was in jeopardy

29

before he filed his complaint.  He had received a performance review detailing areas of concern with his work and specific instances of poor performance.  *See also Barrett,* 245 Mich. App. at 316 (causation not established where there was evidence the employer did not intend to renew the plaintiff's contract before plaintiff filed complaints alleging retaliation); *Shallal v Catholic Services of Wayne County*, 455 Mich. 604, 622 (1997)(causation not established where there was evidence the employer planned to fire plaintiff before she threatened to file complaint against him and where plaintiff was aware of the employer's intentions).

For these reasons, the Court GRANTS Defendant's request for summary judgment on his state law claim that he was fired in retaliation for filing two complaints.

### b.    Legitimate Business Reason

Since Plaintiff established a *prima facie* case on his claim that he was fired in retaliation for filing a lawsuit, the burden shifts to Defendant to rebut the presumption that it retaliated against Plaintiff.  Defendant met this burden by alleging that Plaintiff was fired for insubordination.  *See Manzer v Diamond Shamrock Chemicals Company*, 29 F.3d 1078, 1082 (6th Cir. 1994).  The burden, therefore, shifts back to Plaintiff to prove that Defendant's proffered reason is merely a pretext for discrimination.

### c.    Pretext

"'A plaintiff can demonstrate pretext by showing that the proffered reason: 1) had no basis in fact; (2) did not actually motivate the employer's actions; or 3) was insufficient to motivate discharge.'" *Singfield v Akron Metropolitan Housing Authority*, 389 F.3d 555, 565 (6th Cir. 2004).  Plaintiff seems to rely on the second method.  Under the second method, a plaintiff "admits the factual basis underlying the employer's

30

proffered explanation and further admits that such conduct *could* motivate dismissal."
*Manzer,* 29 F.3d at 1084.   Therefore, the plaintiff must present circumstantial evidence
showing that it is more likely that the employer had an illegal motivation and that the
claimed reason is mere pretext.  *Id.*

Although Plaintiff disputes the characterization of his behavior as insubordinate
or a failure to communicate, he does not deny allegations that 1) he missed deadlines
without explanation or advance notice, even after Jarlett repeatedly asked that he keep
her informed; 2) during the month before he was fired, he failed to timely notify Jarlett
that he would be late for a presentation because of health reasons, and that he would
not attend a training session at all due to his involvement in an auto accident; and 3) he
refused to respond to questions or participate in discussions with VanTilburg and Jarlett
about performance issues, despite a directive that he do so.  He contends that
Defendant's real motivation for firing him is evidenced by the various ways in which she
allegedly treated him less favorably than others or was more critical of him, from the
time he returned to work until he was fired.

Again, the Court resolves this close question in Plaintiff's favor; there is prima
facie evidence that Jarlett acted against Plaintiff in ways which could be construed as
retaliatory.  The only way in which the Court could, nevertheless, find that Defendant
actually was motivated by the legitimate reasons asserted is if it made factual
assumptions about Defendant's true intent.  However, the Sixth Circuit cautions against
granting summary judgment under such circumstances, particularly when the plaintiff
has stated a prima facie claim:

> Courts have recognized that in discrimination and retaliation cases,

31

an employer's true motivations are particularly difficult to ascertain, thereby frequently making such factual determinations unsuitable for disposition at the summary judgment stage.  Several of our sister circuits have urged caution in granting summary judgment once the plaintiff has satisfied the prima facie case.  They have concluded that once a prima facie case is established either by the introduction of direct evidence or reliance on the *McDonnell Douglas* presumption, summary judgment for the defendant will ordinarily not be appropriate on any ground relating to the merits because the crux of a Title VII dispute is the "elusive factual question of intentional discrimination."  We agree that caution should be exercised in granting summary judgment once a plaintiff has established a prima facie inference of retaliation through direct or circumstantial evidence.

*Singfield,* 389 F.3d at 564.  The Court exercises the caution recommended by *Singfield*; there is evidence Jarlett may have been motivated by retaliation despite other legitimate reasons to fire Plaintiff.

## V.   CONCLUSION

The Court **GRANTS** Defendant's motion on Plaintiff's claim that he was fired in retaliation for filing internal complaints; but **DENIES** the motion on Plaintiff's Title VII claim that he was fired in retaliation for filing a lawsuit against Defendant.

**IT IS SO ORDERED.**

s/Victoria A.  Roberts
Victoria A.  Roberts
United States District Judge

Dated:  January 30, 2007

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on January 30, 2007.

s/Linda Vertriest
Deputy Clerk

32